EDWARD C. JONES *vs.* GIDEON HOWLAND & others.

If a party who fears or believes himself insolvent, but does not contemplate stoppage or failure, and intends to keep on, and make his payments, and transact his business, hoping that his affairs may be thereafter retrieved, and in that state of mind makes a sale or payment, without intending to give a preference, and as a meas ure connected with going on in his business, and not as a measure preparatory to, or connected with, a stoppage in business, such sale or payment is not void, as made " in contemplation of bankruptcy," within the meaning of the second section of the United States bankrupt act of 1841, though he immediately afterwards becomes bankrupt.

THIS was an action of trover, brought by the assignee of William H. Stowell, a bankrupt, to recover the value of two specified quantities of oil, conveyed to the defendants by said Stowell. The action was founded on the second section of the United States bankrupt act of 1841, which provides that all " payments, securities, conveyances or transfers of property, or agreements made or given, by any bankrupt, in contemplation of bankruptcy, and for the purpose of giving any creditor, &c. any preference or priority over the general creditors of such bankrupt, shall be deemed utterly void, and a fraud upon this act ; and the assignee under the bankruptcy shall be entitled to claim, sue for, recover and receive the same, as part of the assets of the bankruptcy."

At the trial before *Wilde*, J. a witness, who had been Stowell's clerk from October 3d 1836, to April 23d 1842, testified that Stowell's business had been various and extensive ; that (among other business) he made purchases of oil, in the winter of 1841 – 2, amounting, in the whole, to $50,000 ; that the price

32 *

of oil fell from 94 cents to 75 cents per gallon, in the spring of
1842; and that, in other respects, Stowell's losses were heavy:
That on the 8th of March 1842, a lot of oil was sold by Stowell
to the defendants; that the witness took an account of it and
marked it; that it was rolled from Stowell's candle house into
his shed, for the defendants; that on the 19th of said March, a
portion of the shed was hired by the defendants, where the oil
that was sold to them was stored for them: That on Saturday,
the 23d of April 1842, the witness went to Stowell's counting
room, and Stowell there handed to him a package directed to
E. M. Robinson, one of the defendants, and requested the wit-
ness to deliver it, saying that Robinson would call for a lot of
oil which he (Stowell) had sold to the defendants; and that he
(Stowell) "should have to stop that day;" that he directed the
witness to take an account of the oil and deliver it; that the
witness soon after saw Robinson, and handed him the package;
that when it was opened, he saw some paper in it, and heard
Robinson say " he was surprised that Stowell had got to stop:"
That Robinson and his clerk called, in about an hour, and they
and the witness went to the shed, and took an account of a lot
of oil there; that Robinson had bills of two lots of oil, one of
which was sold to the defendants, and his clerk and the witness
called off the gauges from the casks, and Robinson checked the
bills; and that, on the same forenoon, Robinson brought to
Stowell's counting room certain notes of Stowell to the defend-
ants, with the names erased, which the witness put into the
drawer without examining them.

There was testimony, that Stowell had met his payments reg-
ularly, in March and April, to the day when he stopped. And
various other testimony was offered by the plaintiff, with the
books of Stowell, to show his actual insolvency prior to March
1842.

The defendants called Stowell as a witness, who testified that
he had been in business about seven years; and he stated
the nature and extent of his business, and his gains and
losses. He stated that he opened a new set of books in 1840,
and then believed himself solvent; that he afterwards took

no account of his business and made no trial balance; that his credit was extensive and good, and better in the winter of 1841 – 2 than it had ever been before; that he then purchased oil largely, on long time, and at high prices, of sundry merchants of New Bedford, and elsewhere; that between March 1st and April 23d 1842, his payments were about $40,000; that in the spring of 1842, his business went on as usual; that he had made no examination into his affairs, but believed himself solvent; that he called on the defendants early in March, and stated to them that he feared he should be disappointed in the remittances which he expected from New Orleans and elsewhere; that he should be able to meet his payments to them in April, but thought he should want some accommodation in March; that after several interviews, the defendants proposed to purchase of him oil enough to pay the notes coming due to them in March, and told him they should want the April payments met; that on the 8th of March, a bargain and sale were made of a quantity of oil sufficient to pay the notes coming due in March, at the price of 75 cents per gallon; that on the 19th of March, the oil was marked, an account taken with the defendants, and the oil rolled for them into his shed, a part of which was let to them, at $5 per month, to store it in; and that the oil was removed to the defendants' place of business, on the 11th of April; that he regarded this sale as an accommodation to him; that he had no intention of preferring them; that he expected to go on with his business, and believed himself solvent; that he did in fact go on, meeting all his engagements for March without difficulty; that the remittances and funds, upon which he relied, did not come to hand as expected, and that, early in April, he again called on the defendants, and told them he should want some accommodation from them; that he offered them drafts on the South in payment of the notes coming due to them; that after some interviews with them, they proposed to him to buy oil of him, as had been done in March, sufficient to pay the notes coming due in April and May; that he declined making any arrangements for the May notes, telling the defendants that he should be able to

meet those notes; that on the 4th of April, a bargain and sale were made, at 75 cents per gallon, of oil enough to pay the April notes, $4000 of which were then falling due; that he expected oil would rise in the autumn, and stipulated with the defendants that he should have the privilege of purchasing from them the same quantity, at the same price; that part of the oil was then in his cellar, and part in the process of manufacture; that some days afterwards, it was rolled, as manufactured, into his yard, and that about a week before his failure, an account was taken of it by him, for the defendants, and it was placed in the shed where the other had been stored; that this transaction was an accommodation to him, and that he, at that time, had no expectation or intention of failing; that he expected to go on with his business, and did not mean then, or at any time, to prefer the defendants, and had no motive so to do; that he went on making his payments in April; that about ten days before he stopped, he began to fear that he might not be able to get on, but believed himself fully solvent, and continued his business, hoping for the remittances, and looking for better times; that he made his payments on Friday, April 22d, but was disappointed in receiving aid from Boston to enable him to pay the amounts coming due on Saturday, April 23d; that he found, on Friday night, that he must stop on the next day, but he fully believed himself solvent and able to pay all his debts; that on Saturday morning, he directed his clerk to take to the defendants the bills of the oil which had been sold on the 4th of April, and a letter in which he stated to them that he must stop on that day; that, in this last sale, he had no intention to prefer the defendants, as he believed that all his creditors would be paid; that it was not until after fourteen hours' examination of his books, on the 24th of April, that he knew himself insolvent, or had reason to think himself so.

Other evidence was offered by the defendants, with a view of corroborating the testimony of Stowell.

Upon this evidence, the defendants' counsel prayed that the jury might be instructed as follows: 1. That if, on the 8th of March

Stowell feared or believed himself insolvent, but did not contemplate stoppage or failure, and intended to go along as far as he might, and make his payments, and transact his business, hoping that his affairs might be thereafterwards retrieved, and in that state of mind, made the sale or payment of that day, as a measure connected with going on in his business, and not as a measure preparatory to, or connected with, a stoppage in business, then the sale or payment on the 8th of March was not a sale or payment made in contemplation of bankruptcy, within the meaning of the act. 2. That if the contract of sale, on which the last oil was delivered, was made, on the 4th of April, absolutely and unconditionally, and never rescinded nor abandoned, and the parties within a reasonable time, and with all reasonable expedition, proceeded to execute the same, and if, upon the 4th of April, the bankrupt did not think himself insolvent, nor contemplate insolvency, or bankruptcy, or preference, then, although on the 23d of April, when the contract was executed by delivery, Stowell believed himself insolvent, the sale or payment would not be in fraud of the bankrupt act.

But the judge refused so to instruct the jury, and instructed them as follows: That the case turned upon the second section of the bankrupt law; that the plaintiff must prove three things to the satisfaction of the jury, as contended for by the defendants' counsel, to bring himself within the provisions of that section and to maintain the action: 1st. That Stowell was insolvent at the time he made the sales or transfers of the oil to the defendants: 2d. That he knew or believed he was insolvent at those times: And 3d, that he made them for the purpose of preferring the defendants; and if he knew that he was insolvent at the time, they might infer from that fact, that he made the transfer for the purpose of preferring them; that if he knew or believed himself to be insolvent, he must be supposed to intend the natural result of his act; that if he made a transfer of a large quantity of oil, he must have known that it would operate as a preference; that the plaintiff undertook to show his insolvency, of which there was no doubt, and that he knew it, which was denied; that it was for them to judge, upon al.

the evidence, whether they were satisfied that he knew it. The judge further instructed the jury in respect to the last transfer of oil, the delivery of which was made on the 23d of April, that if Stowell formed the intent to sell it to the defendants on the 4th, and on the 23d, in order to keep his word, completed it, the intent related back to the 4th; but if he then knew that he was insolvent, and completed it from that motive, and also fo. the purpose of giving a preference to the defendants, that is, from the two motives combined, or from the last motive only, the plaintiff would be entitled to recover.

The jury returned a verdict for the plaintiff, which the defendants moved might be set aside, because of the instructions given to the jury. The defendants also moved for a new trial, on the ground that the verdict was against the weight of the evidence.

The argument was had at the last October term.

*Choate* & *Eliot,* for the defendants.

*Coffin* & *Colby,* for the plaintiff.

HUBBARD, J. This case turns upon the fact, whether the respective sales to the defendants by Stowell, which the plaintiff seeks to avoid, were made in contemplation of bankruptcy, and with the view of giving the defendants a preference over his general creditors, or whether they were made with an honest intent, in the transaction of his business, and not in contemplation of bankruptcy. The question presented in the case grows out of the instructions of the presiding judge on committing the cause to the jury; and in considering the subject, it is not necessary to recite the facts as they appeared on the trial.

The instructions to the jury, were embraced in the three following propositions, which the judge charged them it was necessary for the plaintiff to prove, to entitle himself to a verdict: 1st. That Stowell was insolvent at the time he made the sales or transfers of the oil to the defendants: 2d. That he knew or believed he was insolvent at those times: 3d. That he made them for the purpose of preferring the defendants. Under this last head, the judge instructed the jury that, if Stowell knew he was insolvent at the time, *they might infer* from that fact, that

he made the transfer for the purpose of preferring the defendants: That if he knew or believed himself to be insolvent, he must be supposed to intend the natural result of his act: That if he made a transfer of a large quantity of oil, he must have known that it would operate as a preference: That the plaintiff undertook to show Stowell's insolvency, of which there was no doubt, and that Stowell knew it, which was denied by the defendants; and that it was for the jury to judge, upon all the evidence on both sides, whether they were satisfied that he knew it.

The cause has been elaborately argued, and the leading authorities, being principally the adjudged cases in England, commencing with the decisions in the time of Lord Mansfield, and coming down to the present day, have been cited. And though the late bankrupt law of the United States is different, in its provisions, from the English statutes, in respect to payments and transfers of property declared to be void, yet the English decisions throw much light on the language of our statute, which was probably in part framed by incorporating into it the principles of those decisions.

The provision of *St.* 1 Jac. I. *c.* 15, § 2, was, that every person using the trade of merchandize, who should " make, or cause to be made, any fraudulent conveyance of his lands, tenements, goods or chattels, to the intent, or whereby, his creditors shall or may be defeated or delayed for the recovery of their just and true debts, shall be accompted and adjudged a bankrupt." But the words of the United States bankrupt act of 1841, § 2, are, that " all conveyances or transfers of property, *in contemplation of bankruptcy,* and for the purpose of giving any creditor, &c. any preference or priority, &c., shall be deemed utterly void, and a fraud upon this act." This phrase, " in contemplation of bankruptcy," is in common use in the English reports; but Gibbs, C. J. in *Fidgeon* v. *Sharpe,* 5 Taunt. 541, said, " with respect to this doctrine of contemplation in cases of bankruptcy, we have nothing, either in the common or statute law, to show what it is. The cases in which this doctrine was introduced make it depend upon the *quo animo.*"

It is unnecessary to review the various cases in which the subject is discussed; but the later ones state the doctrine, as now received in the courts of Westminster Hall, distinctly. In *Morgan* v. *Brundrett*, 5 Barn. & Adolph. 297, Patteson, J. says, " the recent cases have gone too great a length. They seem to have proceeded on the principle, that if a party be insolvent at the time when he makes a payment or a delivery, and afterwards become bankrupt, he must be deemed to have contemplated bankruptcy at the time when he made such payment; but I think that is not correct; for a man may be insolvent, but yet not contemplate bankruptcy." And Parke, J. says, " the meaning of those words " (in contemplation of bankruptcy) " I take to be, that the payment or delivery must be with intent to defeat the general distribution of effects which takes place under a commission of bankrupt. It is not sufficient that it should be made (as may be inferred from some of the late cases) in contemplation of insolvency. These cases, I think, have gone too far."

The cases referred to, as carrying the doctrine too far, are *Pulling* v. *Tucker*, 4 Barn. & Ald. 382, and *Poland* v. *Glyn*, 2 Dowl. & Ryl. 310. In the last of these, Bayley, J. says, " I take the general rule of law upon this subject to be, that a voluntary payment to one creditor, under circumstances which must reasonably lead the debtor to believe bankruptcy *probable* (not *inevitable*; for I do not think it necessary the rule should go that length,) is a fraud upon the other creditors, within the meaning of the bankrupt laws, and that money so paid may be recovered by the assignees, when a bankruptcy has taken place." And in the other case, Abbott, C. J. after speaking of what was submitted to the jury, says, " indeed, if it were material that the deed should have been executed in contemplation of bankruptcy, there is very strong evidence to show that it was so done in this case; for the bankrupt, being in insolvent circumstances, conveys his real estate to certain persons as a security for debts then due, or any other debts which might accrue due. Such a deed, given under such circumstances, would make bankruptcy inevitable; and a man must be supposed to contemplate the

consequence of his own acts." See also *Flook* v. *Jones*, 4 Bing. 20, an l *Arnold* v. *Maynard*, 2 Story R. 349. The objection to the doctrine drawn from these cases is, that the design to give the preference, in fraud of the law, is directly inferred from the mere fact of the insolvency; whereas such fact does not necessarily prove a contemplated bankruptcy.

The doctrine, we think, is correctly and clearly laid down by Gibbs, C. J. in the case of *Fidgeon* v. *Sharpe*, 5 Taunt. 545. He observes that " the general effect of the statutes on the subject of bankrupts is, that all payments made before bankruptcy are legal and valid ; but a certain class of cases has arisen, in which certain payments have been supposed to be made in fraud of the bankrupt laws, and are, therefore, fraudulent and void. But I find in all the cases, from Fordyce's * to the present, the fact found, that the act was done in fraud of the bankrupt laws. It must be an act, then, not only that in effect contravenes the bankrupt laws, but it must be done with intent to contravene them, and in contemplation of bankruptcy. The innocence or guilt of the act depends, then, on the mind of him who did it ; and it cannot be in fraud of the bankrupt laws, unless the actor meant it should be so." See also *Hartshorn* v. *Slodden*, 2 Bos. & Pul. 582. *Gibbins* v. *Phillipps*, 7 Barn. & Cres. 529. *Atkinson* v. *Brindall*, 2 Bing. N. R. 225, and 2 Scott, 369. *Belcher* v. *Prittie*, 10 Bing. 408.

The result of these cases is the drawing of a distinction between an actual insolvency and a contemplated bankruptcy , between the payment of a just debt in the course of business, though insolvency exists and is known to the insolvent, and the design to give a preference, in view of stopping payment. And in view of all the authorities we hold the law to be this ; that though insolvency in fact exists, yet if the debtor honestly believes he shall be able to go on in his business, and, with such belief, pays a just debt, without a design to give a preference, such payment is not fraudulent, though bankruptcy should afterwards ensue. And on the other hand, if the debtor, being in-

* *Fordyce's case* is reported in 1 Cooke's Bankrupt Laws, (8th ed.) 531

solvent, and knowing his situation, and expecting to stop payment, shall then make a payment or give security to a creditor for a just debt, with a view to give him a preference over the general creditors, such payment or giving security is fraudulent as against the creditors, and property that is transferred, in making such payment or giving the security, may be recovered by his assignee ; and the debtor will not be entitled to a discharge under the statute. It rests upon the intent with which the act was done ; and the intent is to be proved, as a fact, either by direct evidence, or as the necessary and certain consequence of other facts clearly proved.

In respect to the charge of the judge, in the case at bar, it will be found, when carefully examined, to express the opinion that the fact of insolvency being proved, and a knowledge of it on the part of Stowell, the debtor, the jury were bound to infer the intention of Stowell to make a fraudulent preference ; because he must be held to have intended the natural result of his act ; and, consequently, that his act was in fraud of the bankrupt law. This direction, though in accordance with the opinions of the court in *Poland* v. *Glyn* and *Pulling* v. *Tucker*, is, we think, broader than is warranted by the cases of *Fidgeon* v. *Sharpe, Morgan* v. *Brundrett*, and *Atkinson* v. *Brindall*, which, as before observed, we think, lay down the law correctly.

The charge assumes, as a fact, the very thing which is to be proved, namely, the *intent* which actuated the debtor, at the time of making payment ; whereas insolvency may be known to exist, and yet the debtor, though compelled to make sacrifices, be determined to go on with his business, and not yield to the pressure, and thus make payments without any intention of giving a preference in contemplation of bankruptcy. Such instances are not of very rare occurrence ; and such intent should have been more freely submitted to the jury.

It is said that a man must be supposed to intend the natural result of his act. But this remark, though often treated as an axiom, is by no means an infallible proposition. The result is not always evidence of the supposed intent. When we look back upon events that have happened, we stand in a different posi-

tion ; we behold with a clearer vision, as we embrace within our glance the beginning and the end, the act and the consequence.   But the man who is doing the act may contemplate a very different result.   His judgment may be biased by his wishes, and sanguine feelings may be the cause of overlooking difficulties, which to a more quiet temperament might appear insurmountable.   Disappointments also may take place, which were not anticipated.   The experience of others is rarely a guide to an embarrassed man, and he goes on with the hope of relief, even against hope.   To infer, therefore, a design to give a preference to a favored creditor, and in the immediate expectation of bankruptcy, from the mere fact of insolvency, is by no means a certain inference, nor such as the jury would be necessarily bound to draw from the debtor's knowledge of his insolvency.   The evidence must also go further, and establish, as a fact, the design to give the preference — a fact too important to be left upon conjecture.

The instruction requested by the counsel for the defendants was substantially correct.   With some slight modification, it may be stated as follows :   That if, on the 8th day of March, Stowell feared or believed himself to be insolvent, but did not contemplate stoppage or failure, and intended to keep on and make his payments, and transact his business, hoping that his affairs might be thereafterwards retrieved, and, in that state of mind, made the sale or payment of that day, without intending to give a preference to the defendants, and as a measure connected with going on in his business, and not as a measure preparatory to or connected with a stoppage in business, then the sale or payment on that day was not a sale or payment made in contemplation of bankruptcy, within the meaning of the act.

It is insisted by the counsel for the plaintiff, that the case of *Arnold* v. *Maynard,* 2 Story R. 349, is directly in point, to sustain the instructions which were given to the jury.   And it is true that the reasoning there does go to support the cases which the later English authorities say have carried the doctrine of contemplation of bankruptcy too far.   But the case itself, though with some features of similarity, is founded upon a very differ-

ent statement of facts, and in which the design to give the pref-
erence is not drawn into doubt; and the answers to the ques-
tions referred to the court do not advance a doctrine different
from that which we think is correct.

A similar question has arisen before the United States district
court in Vermont. *In the matter of Pearce,* 6 Law Reporter,
261, the learned judge held that "it is not a necessary and legal
inference, that a conveyance was made in contemplation of bank-
ruptcy, merely because the debtor was insolvent at the time;
but it must appear that the conveyance was made by the
debtor in anticipation of breaking or failing in his business, of
committing an act of bankruptcy, or of being declared bankrupt
at his own instance, and intending to defeat the general distri-
bution of his effects." And with this we fully concur

It is unnecessary to remark on the charge under the second
head, further than to say, that if the sale was only partially
executed on the 4th of April, and at the time of completing it,
Stowell knew he must stop, and therefore completed it in order
to give the preference, such sale is fraudulent and void.

We, of course, do not mean to express any opinion upon the
evidence as detailed in the report of the presiding judge; the
questions of fraud, raised by the plaintiff, being peculiarly within
the province of the jury. In conformity with these views, the
verdict is set aside, and a

*New trial granted*